**E-FILED**
Friday, 20 October, 2006  04:05:53 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

GLENN VERSER,
   Plaintiff,

vs.                                                                                  No. 05-1067

MAJOR RAINS, et.al.,
   Defendants

<u>Order</u>

The claims in this case are:

1.      Defendants Brown, Rains, Julie Bohler, Jerry Bohler, Trancoso, and Walker retaliated against the plaintiff for his former lawsuit.

2.      Defendants Stokes, Osafo and Hazelwood retaliated against the plaintiff for a grievance he filed against Defendant Zeman.

3.      Defendants Stokes, Osafo, Hazelwood, Birkey, Hunt, Zessin, Jerry Bohler, Trancoso, Walker and Wexford were deliberately indifferent to the plaintiff's serious medical condition.

(3/24/05 Case Management Order, d/e 9).  The case is now before the court on summary judgment motions.

**Summary Judgment Standard**

A party moving for summary judgment must show, from the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, . . ." that there is no genuine issue of material fact and that the "moving party is entitled to judgment as a matter of law. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P.56©.  This burden can be satisfied by "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.  If such a showing is made, the burden shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Outlaw*, 259 F.3d at 837.  A nonmoving party cannot rest on its pleadings, but must demonstrate that there is admissible evidence that will support its position. *Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 178 (7th Cir. 1994).  In determining whether factual

1

issues exist, the court must view all the evidence in the light most favorable to the non-moving party. *Beraha v. Baxter Health Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992).

## Undisputed Facts

The court determines from the parties' submissions that the facts below are undisputed. Though the plaintiff disputes most of these facts in his responses with conclusory denials, he does not offer any evidence to support an inference that a dispute exists for a jury to decide. Much of the averments in his affidavit are conclusory allegations, inadmissible hearsay, and/ir without foundation or personal knowledge, and are therefore insufficient to create a disputed issue of material fact.

*Undisputed Facts from the Motion for Summary Judgment by Defendants Osafo et al. (d/e 160)[1]*

1.  Plaintiff was incarcerated at the Illinois River Correctional Center for the dates referred to in his Complaint.

2. Plaintiff had a knee brace which contained hinges at certain points in time while an inmate at the Illinois River Correctional Center. *(Affidavits of Dr. Osafo and Dr. Hazelwoodewood).*

3. In November of 2004, Plaintiff's hinged knee brace was replaced with a knee sleeve. *(Affidavits of Dr. Osafo and Dr. Hazelwood).*

4. Dr. Osafo was the Medical Director at the Illinois River Correctional Center for all dates referenced in the Plaintiff's Complaint.

575

5.  The medical records reflect that Dr. Osafo personally examined Glenn Verser on June 30, 2002 and evaluated him for right knee pain from an old injury he alleged to have sustained in 1998. At that time, his examination was unremarkable and he was treated with non-steroidal anti-inflammatories. He was advised to return as needed.  (Exhibit A, Exhibit 1, p. 26).

6. Mr. Verser was again seen by Dr. Osafo on September 18, 2003 regarding a request about getting a knee brace. At that time, Dr. Osafo examined the patient's knee and found it to be in satisfactory condition. (Exhibit A, Exhibit 1, p. 27).

7. On September 18, 2003, Dr. Osafo reviewed the Plaintiff's medical records, which indicated that he had previously been issued a knee brace, so Dr. Osafo issued one as well for a

---

[1]Taken essentially verbatim from d/e 160, along with cites therein.

2

six month period. (Exhibit A, Exhibit 1, p. 27)

8. Mr. Verser requested a low bunk permit on September 29, 2003. The staff physician (Dr. Hazelwood) saw Mr. Verser on October 14, 2003 for this evaluation. The low bunk permit was denied and the patient was once again treated with non-steroidal anti-inflammatories, as well as warm compresses as needed and range of motion exercises. (Exhibit A, Exhibit 1, pp. 28-29)

10. In Dr. Osafo's medical judgment, the treatment by him and Dr. Hazelwood was appropriate. It was also Dr. Osafo's medical opinion that Mr. Verser did not need a low bunk permit at that time. (Exhibit A)

11. Mr. Verser complained once again on October 22, 2003 requesting a low bunk permit.
Dr. Osafo evaluated him at that time. His medical findings were no different from those documented by Dr. Hazelwood on October 14, 2003. However, Dr. Osafo approved Mr. Verser's request for a low bunk permit for a one-year period. (Exhibit A, Exhibit 1, p. 30)

*575*

12. Dr. Osafo saw Mr. Verser again on March 22, 2004 during a hypertension clinic, at which time he requested a renewal of his knee brace. Dr. Osafo examined Mr. Verser's knee. Dr. Osafo's findings were unremarkable; however, Dr. Osafo renewed his knee brace request for six (6) months. (Exhibit A, Exhibit 1, pp. 31-32)

13. On April 17, 2004, Mr. Verser asked for another knee brace, indicating that the one he had received previously had lost its elasticity and requested that it be changed. (Exhibit A)

14. On May 8, 2004, Mr. Verser's knee brace was exchanged. (Exhibit A, Exhibit 1, p. 33)

15. On September 30, 2004, Dr. Osafo saw Mr. Verser, at which time Dr. Osafo renewed his request for a knee brace for six (6) months, as well as his low bunk permit for one year. Dr. Osafo examined his knee and found that his condition had been unchanged. (Exhibit A, Exhibit 1, p. 2)

16. On November 12, 2004, Mr. Verser's knee brace was replaced with a knee sleeve. In Dr. Osafo's medical judgment, the knee sleeve was an adequate substitute for the hinged knee brace the Plaintiff had previously been wearing. (Exhibit A, Exhibit 1, p. 4).

17. The parties dispute why the knee brace was replaced with a knee sleeve. The plaintiff believes that Defendant Stokes, a nurse, directed its confiscation out of retaliation for a grievance the plaintiff had filed against Defendant Zeman about one month prior. Dr. Osafo avers that the plastic supports contained within the knee brace posed a security concern, and that the knee

sleeve worked just as well as the knee brace.  The plaintiff disputes that the knee brace posed security concerns; he says other inmates had the knee brace with plastic supports and there is no written policy against the braces.

18. In Dr. Osafo's medical opinion and judgment, the knee sleeve was a sufficient substitute for the prior knee brace. (Exhibit A)

*575*

19. Mr. Verser was seen by Dr. Hazelwood on December 23, 2004. Mr. Verser requested that his old knee brace be returned to him. This did not occur and Mr. Verser left his knee sleeve behind at that time. Dr. Hazelwood's note indicates that he advised Mr. Verser that there was no clear medical indication for a knee brace. (Exhibit A, Exhibit 1, pp. 9-11)

20. On January 4, 2005, Mr. Verser's knee was evaluated once again. The examination revealed no changes from the prior examination. Mr. Verser was instructed to start an exercise program with quadriceps muscle strengthening for eight (8) weeks and to return if symptoms persist. (Exhibit A, Exhibit 1, p. 12)

21. On February 22, 2005, Mr. Verser complained of increased pain in his right knee and right shoulder pain from an alleged fall which occurred two (2) months previously. Mr. Verser's right shoulder and right knee were examined. These examinations were unremarkable except for vague tenderness in the right shoulder and crepitation in the right knee. Mr. Verser had good quadriceps muscle strength at that time. X-rays were ordered for the right knee and the right shoulder. Mr. Verser was treated with non-steroidal anti-inflammatory medications and was advised to follow up in two (2) weeks. (Exhibit A, Exhibit 1, pp. 14-15)

23. Dr. Osafo again saw Mr. Verser on March 8, 2005 for follow-up of his complaints. Dr. Osafo examined him and found that his condition was unchanged. Mr. Verser was advised that his X-rays were normal. Dr. Osafo prescribed a knee sleeve for him for four (4) months and advised him to follow up. (Exhibit A, Exhibit 1, p. 16)

24. In Dr. Osafo's medical opinion, Mr. Verser has been seen and treated appropriately during each encounter with Dr. Osafo and with Dr. Hazelwood. (Exhibit A)
*575*

25. In Dr. Osafo's medical opinion, Mr. Verser's most serious health issue is his hypertension.   (Exhibit A)

26. In Dr. Osafo's medical opinion, the knee brace which contained hinges was not a medical necessity. Substituting the knee sleeve for this former knee brace poses no risk of substantial harm to Mr. Verser. (Exhibit A)

4

27. At no time did Dr. Hazelwood ever indicate to Mr. Verser that he needed a knee brace. (See Exhibit B)

28. Dr. Hazelwood was a staff physician at the Illinois River Correctional Center in 2003 and during the time frames referenced in Plaintiff's Complaint. (Exhibit B)

29. Dr. Hazelwood saw Plaintiff in July and August 2003, for assessment of his hypertension. (Exhibit B)

30. On October 14, 2003, Dr. Hazelwood examined Mr. Verser for complaints of chondromalacia of his right knee. At that time, he was requesting a low bunk permit. (Exhibit B, Exhibit 1, pp. 28-29)

31. Dr. Hazelwood evaluated his condition on that date and prescribed warm compresses, Motrin, as well as range of motion exercises. In Dr. Hazelwood's medical opinion, he did not believe that a low bunk permit was medically necessary. (Exhibit B)

32. This plan was reached after a full review of Mr. Verser's relevant chart information regarding his right knee. His X-ray reports and physical examination did not suggest that Mr. Verser had a medical need for the remedy he was seeking. (Exhibit B)

33. Dr. Hazelwood saw Mr. Verser again on November 13, 2003 and December 30, 2003 for followup of Plaintiff's hypertension.  Dr. Hazelwood had similar encounters with Mr. Verser on January 21, 2004; January 29, 2004; March 9; 2004; and August 26, 2004.  (Exhibit B)

34. On December 23, 2004, Mr. Verser was seen by Dr. Hazelwood. At that time, Plaintiff was requesting a knee brace which he claimed had been confiscated for security reasons. (Exhibit B, Exhibit 1, pp. 10-11)  Dr. Hazelwood advised Mr. Verser that he did not believe there
was a medical indication for him to have a knee brace. Although Dr. Osafo may have allowed Mr. Verser to have a knee brace or a knee sleeve at various times, in Dr. Hazelwood's medical opinion, he did not believe that such a brace was medically necessary. Dr. Osafo and Dr. Hazelwood disagreed as to whether or not Mr. Verser should be allowed to have this particular medical device.  (Exhibit B)

35. At no time has Dr. Hazelwood changed his opinion regarding whether or not Mr. Verser needs a knee brace. (Exhibit B)

36. On April 6, 2005, Dr. Hazelwood also saw Mr. Verser for his complaints of right knee discomfort and his request for the previously-prohibited type of knee brace.  Dr. Hazelwood did not believe that Mr. Verser needed a knee brace at any time. (Exhibit B, Exhibit

1, pp. 22-23)

37. In Dr. Hazelwood's medical opinion, Mr. Verser was treated appropriately during the time that he was an inmate at the Illinois River Correctional Center. (Exhibit B)

38. As Dr. Hazelwood does not believe Mr. Verser needs any type of knee brace, any type
of knee brace which may be provided to him would be adequate, in his professional opinion. (Exhibit B)

39. During the time frame that he was incarcerated at the Illinois River Correctional Center, Mr. Verser requested a specific type of knee brace subsequent to November 2004, after a similar type of knee brace had been substituted with a knee sleeve. (See Plaintiff's deposition)

40. Dr. Osafo gave him a knee brace support with hinges on each side in September of 2003. (Plaintiff's deposition, pp. 19-20).

41. Plaintiff had this brace at the time he requested a new brace in November of 2004. (Plaintiff's deposition, p. 24)

42. It was Plaintiff's opinion that his knee brace was wearing out and he wanted a new one. (Plaintiff's deposition, p. 20)

43. Plaintiff asked for a new brace from Defendant Stokes. (Plaintiff's deposition, p. 20)

*Undisputed Facts from IDOC Defendants* (d/e 162)

1. On August 28, 2003, after correctional staff received an anonymous note that the Plaintiff was running an electronic repair/alteration business from his cell, Plaintiff's cell was searched and several items of contraband were found in the Plaintiff's property box. (Attached Document 1 of Defendants' Exhibit E,Affidavit of Julie Bohler)  The plaintiff says there was no note, but he offers no evidence to dispute the note attached to Julie Bohler's affidavit.  The note may have made false accusations, but there is no justiciable dispute over whether the note was actually received by prison officials.

2. As a result of the August 28, 2003 search, Plaintiff was placed in temporary confinement and issued a disciplinary report for violations of Departmental Rules 308-Contraband/Unauthorized Property and 104-Dangerous Contraband. (Plaintiff's Exhibit A, pg. 6).

3. The plaintiff maintained that he had been framed by his cellmate.  On September 2,

2003, following a hearing by the adjustment committee, the Plaintiff was found guilty of violating Departmental Rule 308 and disciplined.  He was found not guilty of the dangerous contraband charge.  The imposed discipline was never overturned. (Plaintiff's Exhibit A, pg. 7; Deposition of Plaintiff, pg. 86-87).

4.  At all times relevant to the Complaint, Defendant Brown was assigned to work on the 8 a.m. to 4 p.m. shift.  He was not working when the search of the plaintiff's cell occurred.  Permission for the search was obtained from Shift Commander Patches. (Defendants' Exhibit C, Affidavit of Barton L. Brown; Attached Document 1 of Defendants' Exhibit E). Brown did not conduct the search or write the disciplinary ticket.

5. In October 2004, Defendant was denied a job as a porter in the Health Care.  The defendants maintain that the denial was due to a previous violation of Departmental Rule 203-Drugs and Drug Paraphernalia. (Attached Document 1 of Defendants' Exhibit A, Affidavit of Wayne Germain).

6. Defendant Brown had no involvement in the Plaintiff's denial for a job as a porter in the Health Care Unit. All decisions regarding an inmate's job assignment are made by the Assignment Officer and the Chief Administrative Officer. (Defendants' Exhibit C; Defendants' Exhibit D, Affidavit of Linda Stambaugh).

7. There is no record of Plaintiff ever requesting or being submitted for a job assignment in the barber shop at Illinois River Correctional Center. If a request for assignment to the barbershop is made, standard procedure dictates the completion of a vote sheet regarding said request. Plaintiff's master file includes three completed vote sheets: (1) a March 31, 2003 vote sheet for assignment in the Health Care Unit; (2) an October 6, 2004 vote sheet for assignment in the Bakery and Health Care Unit; and (3) an April 11, 2005 vote sheet seeking an 11-7 work shift. (Defendants' Exhibit A; Defendants' Exhibit D).

8. Defendant Rains had no involvement in the Plaintiff's denial for any request for a job assignment. All decisions regarding an inmate's job assignment are made by the Assignment Officer and the Chief Administrative Officer. (Defendants' Exhibit B; Defendants' Exhibit D).

9. On November 23, 2003, Defendant Julie Bohler received and logged three grievances regarding retaliation submitted by Plaintiff. The grievances were numbered 03-1277, 03-1278, and 03-1279. (Plaintiff's Exhibit B, pg. 4).

10. On November 3, 2003, Defendant Trancoso concurred in the denial of Plaintiff's grievance #03-1104, for the stated reason that the Plaintiff's claims of retaliatory staff

7

misconduct could not be substantiated. (Plaintiff's Exhibit A, pg. 2).

11. On May 3, 2004, Defendant Jerry Bohler concurred in the denial of Plaintiff's grievance #04-0261.  (Plaintiff's Exhibit B, pg. 1).

12. On May 17, 2004, Defendant Jerry Bohler concurred in the denial of Plaintiff's grievance #04-0417.  Plaintiff's discipline was reduced to a verbal reprimand as a result of his filed grievance. (Plaintiff's Exhibit C, pg. 1).

13. On December 2, 2004, Defendant Jerry Bohler concurred in the denial of Plaintiff's grievance #04-1345.  (Plaintiff's Exhibit D, pg. 1).

14. During the relevant dates in Plaintiff's Complaint, Defendant Birkey was acting as the Health Care Unit Administrator.

*Analysis*

## I.  There is no evidence that Defendants Brown, Rains, Julie Bohler, Jerry Bohler, Trancoso, and Walker retaliated against for his lawsuit *Verser v. Washington*, 99-CV-1003 (C.D. Ill).

The plaintiff alleges that he was retaliated against because of the settlement in his lawsuit in *Verser v. Washington*, 99-CV-1003 (C.D. Ill).  He alleges the retaliation took the form of a bogus cell search and consequent false disciplinary ticket in August 2003[2], the failure to give him a job as a health care unit porter in October 2004, the failure to give him a job in the barber shop in November 2003, and the alleged intentional misplacing of the plaintiff's grievances. (Complaint ¶¶ 1-5).

"To succeed on a retaliation claim, the plaintiff must "establish that his protected conduct was a motivating factor behind [the defendants' actions], . . . . [T]he ultimate question is whether events would have transpired differently absent the retaliatory motive . . ." Id. at 275.

First, there is insufficient evidence to link most of these defendants to the adverse actions (the August 2003 search and disciplinary ticket, job denials, and grievance handling).  The search was conducted by an officer Shaw (not a defendant), who also wrote the ticket.  Neither Brown nor Rains wrote the ticket, and Rains' approval of segregation pending a hearing on the ticket is standard procedure.  The plaintiff asserts that these defendants were responsible for his

---

[2]The August 2003 disciplinary report was written by Officer Shaw, who is not a defendant.

job denial, but there is no evidence to support that assertion. Similarly, the plaintiff has no evidence to support that his grievances were intentionally lost by anyone, much less by any of these defendants.

Second, even if the adverse actions that did occur could fairly be attributed to the defendants, there is no evidence that those action were motivated by retaliation for *Verser v. Washington*. The plaintiff's conclusory allegations otherwise are based on the plaintiff's own subjective belief and speculation. The timing is not suspicious. *Verser v. Washington* settled in March 2002 and the plaintiff says he was transferred to Illinois River in May 2002. (d/e 172 in that case). The alleged retaliation by defendants occurred well over one year later.

The plaintiff does aver that Defendant Rains indicated his discontent with the plaintiff's prior lawsuits. The plaintiff also avers that Defendant Brown admitted to the plaintiff that he had the plaintiff's cell searched because of the plaintiff's litigation history. (Plaintiff's Aff. ¶ 5). The court notes that Brown's purported admission did not surface until the Plaintiff's response to the summary judgment motion, in his affidavit. And, it is inconsistent with the plaintiff's earlier claim that his cellmate was the one who framed him with the note. (9/19/03 grievance attached to Complaint--"Verser was fully aware that inmate Jeffers would attempt to frame him in order to have Verser removed from his assigned cell." (9/19/03 grievance attached to Complaint)("my cellie framed me and set me up")(Adjustment Committee final summary report, 9/15/03 run date, attached to Complaint).

In anyevent, there is no evidence that events would have transpired differently even if Rains and Brown harbored retaliatory motive. As discussed above, there is no competent evidence that either was responsible for initiating or conducting the search, writing the ticket, deciding whether the plaintiff got jobs, or handling the grievances. And, there is no evidence that penological justification is lacking for any of these events. For example, the plaintiff does not competently dispute the legitimate preferred reasons he did not get jobs, nor does he have any evidence he should have gotten those jobs. He also has no evidence that the search of his cell lacked penological justification at the time it was done. The plaintiff does not competently dispute the anonymous note received by officials that sparked the search. Perhaps the plaintiff was framed by his cellmate, but there is no evidence that officials had any reason to believe that at the time they received the note and conducted the search. Lastly, that the plaintiff's cellmate was not charged with contraband violations is not sufficient evidence on this record to infer that the search would not have occurred or that the plaintiff would not have been written a ticket based on the contraband found.

**II. There is no evidence to support a reasonable inference that Defendants Stokes, Osafo or Hazelwood retaliated against the plaintiff for a grievance he filed against Defendant Zeman.**

The plaintiff says that Defendant Stokes unilaterally directed the confiscation of the plaintiff's knee brace in November 2004, in retaliation for a grievance he had filed against Defendant Zeman in October 2004.

Even assuming Stokes was responsible for directing the confiscation of the knee brace (which is a stretch), there is no evidence that she was motivated by retaliation for the grievance the plaintiff filed against Zeman. Linking the two is based on speculation and conjecture; their mere co-existence is not enough to infer retaliatory motive. The plaintiff's other assertions of retaliation by Zeman and Stokes remain as undeveloped allegations. Nor is there any evidence that Defendant Hurt's refusal to credit Verser's complaints was improper or motivated by retaliation. There is also no evidence that Defendant Birkey acted improperly or in retaliation for the plaintiff's grievance against Zeman.

**III.  There is no evidence that Defendants Stokes, Osafo, Hazelwood, Birkey, Hunt, Zessin, Jerry Bohler, Trancoso, Walker and Wexford  were deliberately indifferent to any serious medical  conditions of the plaintiff.**

The plaintiff contends that he was diagnosed with a serious knee injury in November of 1998, but he has no evidence to support that assertion. He unsuccessfully made the same claim in a Northern District case, *Verser v. Snyder*, 99-7375 (N.D. Ill):

> Mr. Verser, an inmate . . . claims that he injured his right knee playing basketball in March 1998. . .
>
> Mr. Verser admits that shortly after his injury, his right knee was x-rayed and there was no evidence of injury . . . In May 1999 he was diagnosed with chondromalatia patallae (softening of the cartilage in the knee) by Dr. J. Duffy, a private orthopedic specialist, who suggested more physical therapy. . . He was examined in September and October 1999, and his knee exhibited no abnormalities and showed full range of motion . . . In December, January, and February 1999 he was examined by Dr. Aguinaldo, who found no swelling, tenderness or pain with flexion or extension, . . . In January 2000, Mr. Verser complained to Dr. Smith, who, based on Mr. Verser's file, decided that further physical therapy was not indicated. . . The rest of his medical history as to the knee injury is pretty much the same. There is no evidence of a knee injury.
>
> On these facts, Mr. Verser has no serious medical need with regards to his knee or back, and if he did, he has no evidence of deliberate indifferent to any serious medical needs that he may have had.

*Verser v. Snyder*, 990cv07375 (N.D. Ill)(5/21/02 order granting summary judgment).

10

The plaintiff's lack of evidence has not changed. He has not established a serious medical need or deliberate indifference. Like *Verser v. Snyder*, Dr. Duffy's recommendation in 1998 after the plaintiff's injury (for physical therapy and a brace), does not establish that the plaintiff's knee currently presents a serious medical need for which he needs a particular kind of knee brace. His knee was examined repeatedly by both Dr. Osafo and Dr. Hazelwood. Neither felt that the hinged brace was medically indicated or that the plaintiff's knee presented a serious medical need. The plaintiff's assertion otherwise does not create a justiciable dispute. The plaintiff does not have the medical training necessary to diagnose his knee problem or determine medically appropriate treatment. Similarly, the plaintiff's allegations that he collapsed in December 2004 *because* he did not have a knee brace is without evidentiary support. The most the present record shows is that Dr. Osafo and Dr. Hazelwood disagreed as to whether a knee sleeve was necessary. On the present record, that is nothing more than a disagreement between doctors–not a constitutional violation. *Steele v. Choi*, 82 F.3d 175, 178-79 (7th Cir. 1996); *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). There is no evidence that either opinion was a "substantial departure from accepted professional judgment." *See Estate of Cole v. Pardue*, 94 F.3d 254, 261-62 (7th Cir. 1996). The plaintiff's extensive medical attention documented by defendants negates any possible inference of deliberate indifference.

IT IS THEREFORE ORDERED:

1.     The defendants' motions for summary judgment are granted [d/e's 160, 162]. The clerk of the court is directed to enter judgment in favor of the defendants and against the plaintiff. All pending motions are denied as moot, all dates and deadlines vacated. This case is terminated, parties to bear their own costs.

2.     If the plaintiff wishes to appeal this dismissal, he may file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(c). If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate another strike under 28 U.S.C. 1915(g).

Entered this 20th day of October, 2006.

                                        s\Harold A. Baker
                                        _____
                                        HAROLD A. BAKER
                                        UNITED STATES DISTRICT JUDGE